# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ANTHONY MONTEMARANO, Individually and on Behalf of All Other Persons Similarly Situated, | ) ) ) | |
| | ) | CIVIL ACTION NO. CIV-14-58-C |
| Plaintiff, | ) ) | **CLASS ACTION** |
| v. | ) ) | **JURY TRIAL DEMAND** |
| | ) | |
| EQUAL ENERGY LTD., MICHAEL DOYLE, LEE CANAAN, MICHAEL COFFMAN, VICTOR DUSIK, DON KLAPKO, KYLE TRAVIS, ROBERT WILKINSON, PETROFLOW ENERGY CORPORATION, and PETROFLOW CANADA ACQUISITION CORP., | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Anthony Montermarano ("Plaintiff"), by his attorneys, brings the following class action on behalf of himself and all stockholders of Equal Energy Ltd. ("Equal" or the "Company"), other than Defendants (defined below) and their affiliates, against Equal, certain members of Equal's board of directors (the "Board" or "Individual Defendants"), Petroflow Energy Corporation ("Petroflow"), and Petroflow Canada Acquisition Corp. ("Merger Sub") for breaching their fiduciary duties (or aiding and abetting thereof) in connection with Petroflow's proposed acquisition of the outstanding shares of Equal.  Plaintiff also brings this action individually for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9 promulgated thereunder.  The allegations in the Complaint are based on information and belief, including investigation of counsel and review of publicly available information, except for Plaintiff's own acts, which are alleged on personal knowledge.

## SUMMARY OF THE ACTION

1.     On December 9, 2013, Equal issued a press release announcing that it entered into a definitive agreement (the "Arrangement Agreement") for Petroflow to acquire all outstanding shares of stock of the Company (the "Proposed Buyout").  Pursuant to the Proposed Buyout, the Company's stockholders will receive $5.43 in cash for each share of Equal common stock they currently own.  The Proposed Buyout is expected to close by May 2014.

2.     The Proposed Buyout is the product of a flawed process that is designed to ensure the sale of Equal to Petroflow on terms preferential to Petroflow and other Equal insiders and to subvert the interests of Plaintiff and the other public stockholders of the Company

3.     As a threshold matter, the Proposed Buyout will forcibly change the nature of the stockholders' investment at an unfairly low price and does not recognize the Company's current financial condition and growth potential.  The proposed acquisition price of $5.43 significantly undervalues the Company, as Equal's stock traded at $5.50 per share as recently as December 5, 2013 and $5.72 on December 6, 2013.  Analyst Alistair Toward of PI Financial Corp. ("PI Financial") likewise reiterated his buy recommendation and increased his 12-month price target from $6.00 to $7.00 on November 8, 2013.

4.     Conversely, Equal's management and directors will potentially receive millions of dollars in special payments for unvested stock options, performance units, and restricted shares, which will become fully vested and exercisable at the completion of the Proposed Buyout.  Don Klapko ("Klapko"), Equal's President, Chief Executive Officer ("CEO"), and a director on the Board, alone stands to receive over $3.4 million if he is terminated or if he resigns in connections with the Proposed Buyout.  The Board is thus serving its own financial interests and is adverse to the interests of Equal stockholders.

5.     The Proposed Buyout is also the product of an inadequate sales process that steered the sale of the Company to Petroflow, a former operating partner of Equal's Oklahoma assets and the Company's current management.  Tellingly, although Equal elected not to enter into a transaction with Montclair because of a purported concern that Montclair was not subject to a termination fee even for a failure to obtain the financing necessary to close the transaction, which is exactly what the Board ultimately agreed to with Petroflow.

6.     Keenly aware of the suspect nature of the process and price of the Proposed Buyout, the Board further violated its fiduciary duties to Equal shareholders by agreeing to a provision in the Arrangement Agreement that contractually prohibits the Board from releasing any interested party from a previously entered into confidentiality and standstill provision.  The most likely bidders for Equal (*i.e.*, the previous bidders for the Company during the strategic process) are therefore prevented from topping Petroflow's inadequate bid.  By contractually tying their hands, the Board has breached its fiduciary duty to maximize value in this all-cash sale.  For example, two competing bidders, identified Company A and Company B in the Form PREM14A Preliminary Proxy Statement (the "Proxy") filed with the Securities and Exchange Commission (the "SEC") on December 31, 2013, could have potentially higher bids than Petroflow but are prevented from re-entering the process.

7.     This conduct is particularly flagrant in light of an April 2, 2013 letter from Lawndale Capital Management, LLC ("Lawndale"), a major stockholder in the Company.  In the April 2, 2013 letter, Lawndale accused the Board of "*[a]ttempting to induce [Lawndale] to enter into a standstill without disclosing material information such as the fact that a third party has made a premium bid to acquire the Company and may be planning to run a proxy contest against the Company's nominees . . . .*"

8.     In addition to the anti-waiver provision in the Arrangement Agreement, the Individual Defendants have further exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Buyout with deal protection devices that prevent other bidders from making successful competing offers for the Company.  Pursuant to the Arrangement Agreement, Defendants agreed to: (i) a "no solicitation" provision that precludes Equal from providing confidential information to, or even communicating with, potential third-parties except under very limited circumstances; (ii) an "information rights" provision that requires Equal to provide Petroflow with confidential, non-public information about any competing bidder and their proposal, which they can use to top any bid; (iii) a "matching rights" provision providing for Petroflow to match the terms of any competing proposal; and (iv) a termination fee of $2,000,000 if the Board decided to accept a superior proposal for the benefit of the Company's stockholders.   These provisions conjunctively and improperly create barriers to competing bidders and/or offers and substantially increase the likelihood that the Proposed Buyout will be consummated, leaving Equal stockholders with a limited opportunity to consider any superior proposals.

9.     The Proxy also misrepresents and fails to disclose material information necessary for the Company's stockholders to make an informed decision as to whether to vote their shares in favor of the Proposed Buyout.  Specifically, the Proxy fails to disclose, in violation of both the Board's duty of candor and Sections 14(a) and 20(a) of the Exchange Act, (i) certain information regarding the financial analysis performed by Global Hunter Securities, LLC ("GHS"), the financial advisor to Equal on the Proposed Buyout, in rendering its fairness opinion; and (ii) important details regarding the process leading up to the signing of the Arrangement Agreement.

10.     As a result of the foregoing, and as detailed herein, by agreeing to enter the Proposed Buyout, the Board breached its fiduciary duties to Equal's stockholders.  In the event that Defendants do not cure these fiduciary duties in response to the claims and allegations set forth herein, Plaintiff respectfully submits that the Proposed Buyout should be enjoined, the Arrangement Agreement should be rescinded, and/or damages should be awarded to the proposed Class.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under Sections 14(a) and 20(a) of the Exchange Act.  The Court has supplemental jurisdiction over any claims arising under the state law pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Equal has its primary place of business in this District.

13.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff is, and has been at all relevant times, the owner of Equal common stock.

15.     Equal is an exploration and production oil and gas company with its head office in Calgary, Canada.  The Company maintains its principal executive offices at 4801 Gaillardia Parkway, Suite 325, Oklahoma City, Oklahoma 73142.  The Company's common stock trades on the New York Stock Exchange ("NYSE") and the Toronto Stock Exchange ("TSX") under the ticker symbol "EQU."

16.     Defendant Michael Doyle ("Doyle") is the Chairman of the Board.  He is also a member of the Compensation and Governance & Nominating Committees.

17.     Defendant Lee Canaan ("Canaan") is a director on the Board since May 2013.  She is also on the Audit and Reserves & HSE Committees.

18.     Defendant Michael Coffman ("Coffman") is a director on the Board since May 2013.  He is also on the Audit and Compensation Committees.

19.     Defendant Victor Dusik ("Dusik") is a director on the Board.  He is also on the Audit and Compensation Committees.

20.     Defendant Klapko is a director on the Board and the President and CEO of the Company.

21.     Defendant Kyle Travis ("Travis") is a director on the Board.  He is also on the Governance & Nominating and Reserves & HSO Committees.

22.     Defendant Robert Wilkinson ("Wilkinson") is a director on the Board.  He is also on the Governance & Nominating and Reserves & HSO Committees.

23.     Defendants Doyle, Canaan, Coffman, Dusik, Klapko, Travis, and Wilkinson are collectively referred to hereinafter as the "Individual Defendants."

24.     Petroflow is an independent exploration and production company based in Tulsa, Oklahoma and incorporated under the laws of Delaware.  Petroflow's focus is to apply new exploration, completion, development techniques to old fields to unlock previously untapped reserves that were either passed over or never fully exploited.

25.     Defendant Merger Sub  is  an  Alberta, Canada corporation and is a wholly-owned subsidiary of Petroflow.  Merger Sub was created solely for the purposes of effectuating the Proposed Buyout.

26.     Equal, Petroflow, Merger Sub, and the Individual Defendants are collectively referred to herein as the "Defendants."

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

27.     By reason of the Individual Defendants' positions as officers and/or directors of Equal, they owe fiduciary duties to Plaintiff and the other public stockholders of Equal, including the duty of loyalty, due care, good faith, and candor.  Among these fiduciary duties are (1) the duty of the Board to maximize the price by securing a fair premium for Equal stockholders and (2) the duty of the Board to avoid conflicts of interest or divided loyalties by preferring one stockholder or a group of stockholders' interests over another.

28.     Thus, where the officers and/or directors of a publicly traded entity undertake a transaction that will result in either: (i) a change in corporate control; (ii) a breakup of the entity's assets; or (iii) sale of the entity, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the entity's stockholders, and if such transaction will result in a change of control, the stockholders are entitled to receive a significant premium. To diligently comply with their fiduciary duties, the directors and/or officers may not take any action that:

a.     Adversely affects the value provided to the entity's stockholders;

b.     Favors themselves or will discourage or inhibit alternative offers to purchase control of the entity or its assets;

c.     Contractually prohibits them from complying with their fiduciary duties;

d.     Will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the entity's stockholders; and/or

e.     Will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public stockholders.

7

29.     In accordance with their duties of loyalty, due care, good faith, and candor, the Individual Defendants, as directors and/or officers of Equal, are obligated to refrain from:

      a.     Participating in any transaction where the directors or officers' loyalties are divided;

      b.     Participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public stockholders of the entity; and/or

      c.     Unjustly enriching themselves at the expense or to the detriment of the public stockholders.

30.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Buyout, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, due care, good faith, and candor owed to Plaintiff and other stockholders of Equal, or are aiding and abetting others in violating those duties.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all stockholders of Equal who are being and will be harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

32.     This action is properly maintainable as a class action for the following reasons:

      a.     The Class is so numerous that joinder of all members is impracticable. As of November 4, 2013, Equal had 35,806,337 shares of common stock outstanding. The holders of these common shares are believed to be geographically dispersed throughout the United States;

b.      There are questions of law and fact that are common to the Class and which predominate over questions affecting any individual Class member.   The common questions include, *inter alia*, the following:

     i.      Whether the Individual Defendants breached their fiduciary duties and other common law duties by entering into the Arrangement Agreement;

     ii.      Whether the Individual Defendants have breached their fiduciary duty to maximize stockholder value for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Buyout;

     iii.      Whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets;

     iv.      Whether the Individual Defendants misrepresented or omitted material facts in violation of their fiduciary duties owed by them to Plaintiff and other members of the Class;

     v.      Whether Plaintiff and the other members of the Class would suffer irreparable injury were the transactions complained of herein consummated;

     vi.      Whether Equal, Petroflow, and Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty; and

     vii.      Whether Plaintiff and/or the Class are entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

c.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

d.      Plaintiff is an adequate representative for the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members

of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede the ability to protect their interests; and

        f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

SUBSTANTIVE ALLEGATIONS

**A.    Background**

33.     Enterra Energy Trust (the "Trust"), the predecessor to Equal, was originally organized in 2003 as an income trust focused on acquiring crude oil and natural gas properties and developing and producing crude oil and natural gas in western Canada. In early 2006, the Trust doubled its size by acquiring the Hunton play and certain other assets in Oklahoma for $246 million from a group of private sellers, which included W. Cobb Hazelrig ("Hazelrig"), Frederick Wedell ("Wedell"), Richard Azar ("Azar"), and Donny Seay ("Seay"). Importantly, Hazelrig and Wedell are now the principal shareholders of Montclair Energy, LLC ("Montclair"), and Azar and Seay are current shareholders of Petroflow.

34.     Also in 2006, the Trust and Petroflow Energy Ltd. (a publicly-traded entity that was the predecessor to current Petroflow)[1] entered into a farmout arrangement (the "Farmout Agreement") for Petroflow to develop the Oklahoma assets. Pursuant to the Farmout Agreement, Petroflow was obligated to fund 100% of the drilling and completion costs on the underdeveloped lands to earn a 70% working interest. The Trust retained a 30% working

---

[1]     For consistency, the complaint will use "Petroflow" to describe both past and present corporate structures of Petroflow.

interest.  Petroflow was also required to maintain a certain pace of drilling to continue its right to drill on the lands covered by the Farmout Agreement.

35.     On October 31, 2006, the Canadian Minister of Finance announced the Canadian federal government's plan to change the tax treatment of income trusts.  However, existing trusts were provided with a four-year grace period and were not be subject to the new tax rules until 2011, as long as such trusts experienced only "normal growth."

36.     By late 2007, the Trust suffered significant losses (almost to the point of insolvency) due to cost of debt financing and reductions in the market prices of natural gas.  In fact, the Trust's stock price declined 95% from 2005 to 2007.

37.     On June 30, 2008, defendant Klapko became the Trust's President and CEO.

38.     In late 2009, the Trust's board of directors and management unanimously approved proceeding with a corporate reorganization to convert the Trust into a growth-oriented exploration and production company.

39.     On December 15, 2009, the Trust announced that it had delivered a notice of termination for non-performance under the terms of the Farmout Agreement to Petroflow because of Petroflow's failure to maintain a certain pace of drilling a seven county area in the Oklahoma Hunton play.  The Trust then placed liens against the producing wells already drilled under the Farmout Agreement, which caused third party purchasers of production from the wells to withhold revenues from Petroflow until the claims between Petroflow and the Trust were settled.

40.     On May 25, 2010, Petroflow announced that two of its wholly-owned subsidiaries had filed for Chapter 11.  As a result, the Trust was exposed to the farmout partners for approximately $18.4 million.

11

41.     On May 31, 2010, the Trust completed the conversion into a corporation.  As part of the conversion, the Trust's units were consolidated on the basis of 3 trust units for every one share of Equal.

42.     In June 2010, Petroflow took certain actions to prevent Equal from conducting its drilling program on its properties in the Oklahoma Hunton play that were related to the Farmout Agreement, which had a significant impact on the ability of Equal to develop these properties. Petroflow and its Chapter 11 debtor then brought suit against Equal to determine the parties' rights and obligations under the Farmout Agreement and to recover certain fraudulently transferred payments.

43.     In early 2011, Equal and Petroflow agreed to settle their dispute and terminate the Farmout Agreement.

44.     On April 26, 2011, Equal then announced that it had entered into a purchase and sale agreement with Petroflow and certain Petroflow subsidiaries.  Pursuant to the purchase and sale agreement, Equal acquired Petroflow's interests in the Oklahoma Hunton play developed under the Farmout Agreement for $93.5 million.  As part of the transaction, Equal and Petroflow equalized, on a 50/50 basis, the interests in zones above the Hunton play in sections developed under the Farmout Agreement, and Petroflow was allowed to operate a development program over these uphole assets.

### B.     The 2012 Strategic Process

45.     On May 3, 2012, Equal announced that it had initiated a strategic review process. The press release stated, in relevant part, the following:

> Calgary, Alberta—(May 3, 2012) Equal Energy Ltd. ("Equal" or the "Company") (TSX: EQU) (NYSE: EQU) announces that its Board of Directors has initiated a strategic review process to identify, examine and consider alternatives with the view to enhancing shareholder value.  Strategic alternatives may include, but are not limited to, the sale of all or a portion of the Company's assets, the outright

sale of the corporation, a merger or other business combination, a recapitalization, acquisitions, as well as continued execution of its business plan, or any combination thereof.

The Board of Directors believes that the Company's shares trade at a significant discount to the value of the underlying assets, especially given its high-quality Cardium and Viking oil plays in Canada, its Hunton liquids rich gas play and its emerging Mississippian light oil play in Oklahoma.

In response, the Board of Directors has established a Special Committee comprised of independent directors to oversee the strategic review process. To assist it in achieving its objectives, the Special Committee has retained Scotiabank as its advisor. Parties interested in obtaining additional information regarding this process or the Company can contact Scotiabank at the number listed below. This process has not been initiated as a result of any particular offer.

It is the Company's current intention not to disclose developments with respect to the strategic review process until the Board of Directors has approved a specific transaction, action plan or otherwise determines that disclosure is necessary or appropriate. The Company cautions that there are no assurances or guarantees that the process will result in a transaction or, if a transaction is undertaken, the terms or timing of such a transaction. The Company has not yet set a definite schedule to complete its evaluation or process.

46. Notably, the identities of the members of the Board appointed to the 2012 Special Committee were not disclosed.

47. On September 24, 2012, the Company announced sale of Northern Oklahoma assets and the decision to retain Central Oklahoma Hunton Assets.

48. On October 1, 2012, the Company announced the sale of Halkirk/Alliance/Wainrwright/Clair assets and substantially all remaining non-producing Canadian assets. The identity of the purchaser of the Halkirk/Alliance/Wainrwright/Clair assets and substantially all remaining non-producing Canadian assets was not disclosed.

49. On November 2, 2012, the Company announced the sale of Lochend Cardium assets. The identity of the purchaser of the Lochend Cardium assets was not disclosed.

50.     On November 27, 2012, the Company announced the conclusion of the strategic process, of which Petroflow was a part of, after a lengthy six month process.  The press release announcing the completion stated, in relevant part, the following:

**Calgary, Alberta—November 27, 2012**—Equal Energy Ltd. (TSX: EQU) (NYSE: EQU) announced several important initiatives today stemming from its recently-concluded strategic review process.

Highlights include:

- An agreement to sell Equal's remaining royalties and fee title lands in Western Canada to Keystone Royalty Corp. for $11.4 million in cash.
- Initiation of a USD$0.20 per share annual dividend, starting on January 1, 2013.
- A review of the composition of the board of directors and senior management team.
- A review of compensation policies.
- A major reduction in debt as a result of recent asset sales.
- A focus on the liquids rich, natural gas Hunton property in Central Oklahoma.
- Consideration of significant future acquisitions.

Equal also released details of its 2013 operating and capital budget, including a modest, year-over-year increase in liquids rich, natural gas production from the Central Oklahoma assets, an estimated cash flow of $33 million, and a $36 million capital budget.

"Our shareholders and other stakeholders have spoken, and we have listened", Don Klapko, Equal's President said.  "The strategic review and the plan we are announcing today greatly strengthen our company.  We believe the new dividend is well within our financial resources.  Our balance sheet is strong with approximately $150 million of cash and borrowing capacity combined."

Mr. Klapko added: "We are now in a position to consider significant accretive acquisitions providing additional growth opportunities.  Furthermore, continued recovery in natural gas and natural gas liquids pricing provides significant additional upside."

**Sale of Royalty Assets:**

Under an agreement with Keystone Royalty Corp., Equal will sell its royalties and fee title lands in Western Canada for $11.4 million in cash . Equal has also agreed to assign residual resource income tax pools to Keystone under the provisions of the Canadian Income Tax Act for $0.75 million in cash.  The effective date of the

agreement is October 1, 2012 and closing is scheduled for December 13, 2012. The date of the assignment of the income tax pools has not been determined.

**Conclusion of Strategic Review:**

The strategic review process that began on May 3, 2012 is now complete.  Dan Botterill, Equal's chairman, said: "We are pleased to have brought the review to a successful conclusion.  We are confident that the measures now being put in place herald an even brighter future for Equal."

Mr. Botterill added that, as part of the process, the board will review its own make-up, the composition of the executive management team, and the company's compensation policies.

The strategic review has resulted in the sale of the following assets:

1. Northern Oklahoma
2. Halkirk, Alliance, Wainwright, Clair and major abandonment liabilities
3. Lochend Cardium
4. Canadian royalties and fee title lands

The strategic review and subsequent actions have brought substantial benefits to Equal.  Among them:

- Proceeds from the asset sales total $129.5 million, averaging over $48,000 per boe/d of production and $19.00 per boe of proven plus probable reserves.
- A major reduction in corporate net debt from $149 million at the onset of the review to an estimated $23 million at the end of 2012 including a cash balance of $22 million. Equal's debt-to-cash flow ratio is in the top 10% of our current competitor peer group.
- The Central Oklahoma asset base has growth potential from drilling in addition to significant upside associated with a recovery in natural gas and natural gas liquids pricing.  Equal has retained approximately 75% of the production and 80% of its reserves that existed at the onset of the strategic review.
- The cash reserves combined with an undrawn bank credit facility of $125 million allow the company to consider additional strategic growth strategies including acquisitions.
- A single asset base that creates focus and clarity for management and shareholders.  Equal is now an exploration and production company operating solely in Central Oklahoma, which will allow management to focus on growth and cost efficiency.  General and administrative costs will be reduced significantly.
- A reduction in asset retirement obligation from $31 million to $10 million.

The graph below compares the shareholder return on a $100 investment in Equal common shares to the return in the S&P/TSX and the S&P/TSX Energy Index from the start of the strategic review process on May 3, 2012 to November 20, 2012.



"Investors have clearly recognized that the strategic review would yield tangible and positive results", Mr. Botterill said.  "The measures that we are announcing today fully justify that confidence."

Scotiabank and Desjardins Capital Markets acted as advisors on the strategic review process.

51.    On November 29, 2012, Mr. Nawar Alsaadi ("Alsaadi") and Dr. Adam Goldstein

("Goldstein"), owner of approximately 4.93% of the Company's outstanding shares, published a

press release criticizing Equal's strategic review process.  The press release stated, in relevant

part, the following:

VANCOUVER, Nov. 29, 2012 /CNW/—In response to Equal Energy's November 27th 2012 press release highlighting the conclusion of the strategic review, Mr. Nawar Alsaadi and Dr. Adam Goldstein, "Shareholders Group", jointly owning 4.93% of the company's outstanding shares, would like to make the following statement:

The Shareholders Group believes that the management and the special committee of the board of directors has failed in its primary review objective of closing the significant gap between the value of the shares and that of the company's underlying assets.  As a matter of fact, as a result of the asset dispositions undertaken during the review process this valuation gap has further widened.

Thus in light of the company failure to achieve its stated review objective, the Shareholders Group recommends the following:

- The immediate halt of the company's pursuit of accretive acquisitions and focusing instead on returning value to shareholders.
- The initiation of a substantial Dutch auction tender offer at a price range of $3.5 to $4.5; such a tender would significantly enhance the net asset value per share for current shareholders, while providing a liquidity event for selling shareholders.
- Materially increasing the amount of the announced annual dividend.
- The introduction of shareholder representatives on the board of directors.
- The resumption of the strategic review process to further explore alternatives to enhance shareholder value.

Equal Energy continues to be significantly undervalued.  A simple inspection of the company's approved credit lines of $125m reflects a minimum enterprise value of $250m solely for the company's PDP reserves through applying the banks customary 50% discount to the value of such assets, which corresponds to a stock price of $6.49/share vs. the current stock price of $3.24.

We believe the above steps will be instrumental in re-establishing shareholder confidence in Equal Energy and closing the substantial valuation gap between the company's underlying assets and its market price.  Failure to undertake the above recommendations would entail further action on our part to safeguard and protect shareholder value.

A letter highlighting the above in more detail will be addressed to the company's board of directors shortly.

52.    On December 3, 2012, Equal responded to Alsaadi's and Goldstein's press release

by stating the following:

**Calgary, Alberta—December 3, 2012**—Equal Energy Ltd. (TSX: EQU) (NYSE: EQU) today reasserted its commitment to a prudent and balanced long-term strategy in the face of reckless demands by two dissident shareholders and bloggers that risk jeopardizing the company's long-term stability.

"Our recently-completed strategic review seeks a balance between future growth and return of capital to shareholders", Don Klapko, Equal's President and Chief Executive Officer, said. "By contrast, the dissidents' demands are more short-sighted, and not in the interests of long-term financial stability and sustainable valuation for our shareholders."

Mr. Klapko added: "We have worked in good faith over several months to engage the dissidents, Mr. Nawar Alsaadi and Dr. Adam Goldstein.  They continue to show little understanding of the opportunities and risks in the natural-gas business, or of Equal's operations and financial capabilities.  Mr. Alsaadi and Dr. Goldstein appear to be active financial bloggers with little experience in running a public company which, unlike social media, operates in a regulated environment and requires a higher level of responsibility."

Dan Botterill, Equal's Chairman, said: "Some of Mr. Alsaadi's and Dr. Goldstein's demands would restrict the board from exercising its fiduciary duty to shareholders.  We wish to assure all our shareholders that we will remain accountable to them, and not to a minority of voices interested only in financial engineering."

Equal wishes to respond specifically to several demands and misleading allegations made by the dissidents in their press release dated November 29, 2012:

- The recent strategic review concluded that acquisitions would be considered only as one of a variety of options.  Having worked so hard in recent years to lighten Equal's debt burden, the board and management have no intention of taking any action that would weaken the balance sheet.

  Equal has no plans for any major acquisition. Even so, it would be wise to take advantage of opportunities for smaller, tuck-in transactions that could enhance the value of the Oklahoma assets.  In any case, no acquisition would be considered that was not accretive and beneficial to shareholders.

- A substantial share buyback would significantly weaken the company's balance sheet, potentially leaving it dangerously exposed to swings in the volatile natural-gas market.

  The board and the company's financial advisers firmly believe that the current strength of the balance sheet is now one of Equal's most valuable assets.  It is critical in current market conditions to maintain a debt-to-cash flow ratio of less than 1.0, which the board and our advisers believe can be maintained under the 2013 budget plan.  The current ratio is 0.7, but this will rise towards 1.0 with the payment of a dividend in 2013.

- As announced on November 27, 2012, Equal has initiated an annual dividend of USD$0.20 per share.  The level of the dividend payment reflects a balance between returning as much value as possible to shareholders while maintaining a prudent debt-to-cash flow ratio in uncertain economic times, as outlined above.

Although the board and management are confident that natural-gas liquids prices will maintain their recent improvement, we do not see a full recovery until 2014.

Mr. Klapko said: "In all that we do, we are determined to ensure that we do not take Equal back to the dark days of five years ago when its predecessor over-extended itself by taking on too much debt.   An unsustainable dividend—as now demanded by the dissidents—was exactly what landed the company in trouble then."

- As mentioned in the November 27 release, the strategic plan includes a review of the composition of the board and senior management team, as well as a review of compensation policies.

More generally, management and the board have listened to Equal's shareholders. During the course of the strategic review, a number of models were tested by the company and its legal and financial advisors.  It became clear that the present course of action is the most realistic path to preserve and enhance value for our shareholders.

Mr. Botterill added: "We appreciate the support we have received from many shareholders.  Equal's board and management will not allow the distraction caused by a handful of dissidents to slow down the execution of our strategic plan to preserve value for shareholders.  We have a fiduciary obligation to consider both short- and long-term factors.

"***Now that we have completed our strategic review, we are firmly focused on delivering results under the 2013 business plan and on positioning Equal to take advantage of the anticipated recovery in commodity prices***."

(Emphasis Added).

53.     Yet, the Board continued the strategic process into 2013 rather than follow through on the 2013 business plan as announced.

### C.     The 2013 Strategic Process

54.     On January 31, 2013, Equal received a proposal from an interested party ("Company A") relating to a potential business combination.

55.     On February 11, 2013, Equal informed Company A that its proposal was inadequate and it was not interested in pursuing further negotiations.

56.     On March 25, 2013, Montclair publicly announced that it delivered a proposal to the Board on February 27, 2013 to acquire all of Equal's outstanding common stock for $4.00 per share in cash.  Hazelrig, as CEO of Montclair, stated the following: "Montclair's proposal would provide shareholders of Equal Energy with a unique and attractive opportunity to receive a substantial premium for their Equal Energy shares.  Although we expect that Equal Energy shareholders would welcome this proposal, Montclair was advised on March 15, 2013 that the Board of Directors of Equal Energy had rejected our proposal."

57.     Also on March 25, 2013, Equal issued a press release confirming the receipt of Montclair's $4.00 offer.  The press release further stated the following:

> In response to Equal's receipt of the afore-mentioned Proposal and a number of verbal non-binding and conditional expressions of interest for a potential transaction, the board of directors of Equal formed a special committee (the "Special Committee") of independent directors in early March to investigate and evaluate all proposals presented to Equal.  Global Hunter Securities, LLC and Scotia Waterous Inc. were engaged as financial advisors to assist the Special Committee.  The Special Committee, with the assistance of its financial and legal advisors, intends to consider such expressions of interest in a deliberate and thoughtful manner with a view to the best interests of Equal before undertaking any specific course of conduct.  Equal did not intend to disclose, nor will it disclose further, developments with respect to the process being undertaken by the Special Committee unless and until the board of directors has approved a definitive transaction.

> Equal has engaged in discussions with a number of potential suitors, including Montclair, to understand the terms and conditions of their expressions of interest and the value proposition they represent.  Montclair's unsolicited and conditional proposal was rejected, as Montclair requested a response prior to the completion of the Special Committee's process.  Equal would be pleased to consider further proposals from Montclair as part of the Special Committee's process.

> There is no assurance that the Special Committee's process will result in the receipt of a definitive proposal and, if received, that such proposal will be recommended by the Special Committee or the board of directors or that such proposal will be implemented.

58.     The identity of the Special Committee members was again not disclosed.

59.     On April 1, 2013, Company A presented Equal with another business combination proposal below the previous $4.00 price offered by Montclair.

60.     On April 2, 2013, Lawndale sent a letter to the Board responding to the March 25, 2013 press releases by Montclair and Equal and the others' indication of interest in a transaction with Equal.  The letter stated, in full, the following:

> As you know, Lawndale Capital Management, LLC, through the funds it manages, now owns over 1.5 million shares and over 4% of Equal Energy, Ltd. (NYSE: EQU) ("Equal" or the "Company").  After last week's disclosure of the Montclair Energy, LLC group's holdings, Lawndale and its affiliates ("Lawndale") are Equal's 3rd largest independent shareowner.
>
> . . . .
>
> We purchased our sizable ownership in Equal over the past few months with the expectation that near- and medium-term prospects in the NGL markets (particularly propane) and medium—and long-term prospects in the natural gas markets would improve, which would benefit all companies in this market.  More specifically, we believed that Equal's market price failed to fairly reflect both these prospects and prospects specific to Equal's own energy production and reserves. As important, our decision to acquire a significant ownership position in Equal was based upon our careful review of Equal's governance structure, and our conclusion that we could add value to Equal and its shareholders by working to improve the company's board composition and governance structures.
>
> We write this letter in response to the March 25, 2013 press releases by Montclair Energy that it made a proposal to acquire Equal for the price of $4/share and by Equal that it has received expressions of interest in a transaction with Equal from "a number of" other parties (the "March 25th Releases").  We have also now begun review of the Company's preliminary Proxy Statement (Schedule 14A) filed with the SEC on March 28, 2013 (the "Proxy").
>
> As an initial matter, based upon our analysis to date, we want you to know that we agree with the Board's preliminary assessment that the $4 per share price offered by Montclair for Equal does not recognize the intrinsic value of Equal.  For that reason, and based upon our substantial experience in these matters, we were pleased to read that Equal's board of directors formed a special committee of independent directors (the "Special Committee") and engaged financial advisors to evaluate all proposals presented to the Company.  However, we feel that Equal and its advisors should not limit its evaluation simply to proposals *"presented"* to the Company but work with its financial advisers to reach out to any potentially interested party for additional proposals that could maximize shareholder value.

As part of this process, we would expect that Equal would approach the multiple parties who participated in last year's asset sale process as well as such companies as New Source Energy Partners, L.P. (NYSE: NSLP), a newly public entity also focused on Equal's Oklahoma Hunton operational area.  We note that New Source recently went public at and continues to trade at valuation multiples, substantially higher than Montclair's proposed purchase price.

Furthermore, in light of the favorable prospects upon which we based our investment, we feel the board, working with the Company's financial advisors, should consider additional potential restructuring or other transactions that may increase shareholder value in the short-term, while also allowing shareholders the opportunity to continue to participate in the Company's long-term growth prospects.

Critical to any decision is the process engaged in by the board, which should be led by strong, independent directors.  As you know, on February 21, 2013, Lawndale submitted the names and resumes of two highly qualified independent and energy sector-experienced individuals (that we independently found and interviewed) to Equal's Governance and Nominating Committee for inclusion as part of the Company's director nominee slate, replacing legacy directors of your choosing.  As residents of Houston, Texas, these independent nominees lived closer to Equal's sole remaining operations in Oklahoma than current legacy board members who all reside in Canada.  We proposed these individuals—who again had no prior contact or experience with Lawndale—because we strongly believed in the need to improve the independence and strength of Equal's board, particularly in light of the Company's increased liquidity and narrowed focus on the Company's sole remaining assets in Oklahoma.  It is imperative that capital allocation choices are properly, objectively and independently weighed as well as the decision to remain an independent public company vs. merging with another, or being completely bought out.

Candidly, Lawndale was dismayed at your initial refusal to bring our nominees into a process for new directors that included only insider-sourced nominees.  Our understanding is that the board's initial process began shortly before we identified the potential new candidates, and that the board process was conducted at the same time that Equal's board amended the Company's by-laws in a manner which potentially entrenches the current board and limits shareholders from proposing new nominees.

We are glad you learned to appreciate the independence and qualifications of the nominees we suggested.  Likewise, through dialogue and interviews, we became comfortable enough with your insider-sourced prospective nominees to reduce our shareholder representation request to include just one of the two nominees we submitted for the Company's upcoming May Annual Meeting slate.  You and your committee initially chose Mr. Robert Parkey.

Unfortunately, according to the preliminary Proxy, you apparently have now chosen not to nominate Mr. Parkey to Equal's board of directors. *We can only assume that the reason for your actions—despite your admission that he would be a good independent director, whose presence would benefit all shareholders—is because Lawndale is unwilling to enter into the overly broad and wholly improper "standstill" agreement proposed by your counsel*. As you know, the standstill agreement you proposed would effectively prohibit Lawndale from communicating with the Company's other shareholders about issues of mutual concern. As a general matter, requesting that Lawndale enter into such a standstill was inappropriate given that Mr. Parkey is an independent director with no prior affiliation with Lawndale.

However, your request is especially egregious in these circumstances insofar as it was made at a time when you obviously knew about the issues raised in the March 25th Releases, *but did not inform Lawndale or the public of this information prior to urging Lawndale to enter into the standstill agreement. Attempting to induce a significant shareholder to enter into a standstill without disclosing material information such as the fact that a third party has made a premium bid to acquire the Company and may be planning to run a proxy contest against the Company's nominees is, to say the least, not what Lawndale considers to be a model of good corporate governance.*

Some of the Company's other recent actions also give us great cause for concern. For example, it is now clear that Equal's board issued several hundred thousand shares of new stock, authorized stock options with grant date pricing potentially not reflecting Montclair's offer and/or others interest in the Company, and apparently did not take steps to preclude insiders from purchasing shares of stock in the open market from sellers who did not have the benefit of this undisclosed information. We believe independent directors more focused on shareholders and good governance would have raised the obvious governance and possible legal liability issues created by the above transactions.

All of these actions make it critical for Equal to elect highly qualified and engaged independent directors whose interests and actions are solely aligned with shareholders and who are free of conflicts under both the letter and spirit of listing regulations. Lawndale has provided Equal with the names and background information of such individuals-individuals who, quite frankly, we believe Equal would be fortunate to have as directors and who have no prior affiliation with Lawndale.

In addition to including Mr. Parkey amongst the nominees for Equal's board, we believe the Board should also reconsider and revise its recently adopted advance notice by-laws and other recent by-law amendments. We believe that these actions may have been taken in haste, going beyond what is customary and necessary, and send an improper message to the market that Equal is not interested in engaging with its shareholders. We note that the preliminary Proxy

recently filed for the May 13, 2013 Annual Meeting asks shareholders to approve all your by-law changes as part of one bundled measure.  While some of the changes adopted by the Board may have been minor, bundling those in one proposal along with other unacceptably entrenching amendments, in particular, certain aspects of the advance notice by-law, may not be changes that Lawndale can support as it is presently drafted.

At this time, while Equal is about to engage in a process to determine the future of the Company, it is particularly important for the board to have the confidence of the Company's shareholders and for the shareholders to believe that the board is acting in an informed and independent manner.  The board can start this process by eliminating many of the barriers it recently adopted to shareholder participation in the election process, adding some strong new independent nominees to the board and then conducting a full, and fair and thorough evaluation of all alternatives to maximize shareholder value.

We believe it is in the best interests of the Company and its shareowners for all of us to work together to expeditiously improve the Board's composition and the Company's corporate governance practices.

(Emphases Added).

61.     On April 9, 2013, GHS contacted Petroflow regarding its interest in a business combination with the Company.  Also on April 9, 2013, Equal established a virtual data room with information for potential bidders.

62.     On April 16, 2013, Petroflow purportedly indicated that it was not going to participate in the process and importantly ***did not*** execute a confidentiality agreement sent over by Equal.

63.     On April 23, 2013, Equal received a revised non-binding proposal from Company A.  Company A also requested to make a presentation to the Special Committee, GHS, and Equal management.  The Special Committee and the Board as a whole refused to allow Company A to make a presentation, deeming Company A's revised proposal to not be reasonable.

64.     On May 1, 2013, Equal received an indication of interest from another party involved in the strategic process ("Company B").  After several rounds of due diligence, on June

14, 2013, Equal and Company B entered into a 45-day exclusivity agreement following Company B's revised offer of $5.00.  As a result, on June 26, 2013, Equal sent correspondence to five other parties that had executed confidentiality agreements informing them that access to the virtual data room was being revoked immediately.  One party that was participating in the process contacted Equal for further clarity on the closure of the data room, but were told that Equal could not comment further on the reasoning behind the closure of the data room.

65.     After the expiration of the exclusivity period with Company B, on August 14, 2013, Montclair publicly disclosed that it presented the Board with an improved non-binding offer of $4.75 per share in cash.

66.     On August 15, 2013, Equal publicly confirmed the receipt of Montclair's $4.75 offer and indicated that the Special Committee was reviewing the new proposal.

67.     On August 20, 2013, Equal publicly announced that it rejected Montclair's revised $4.75 per share offer.  The press release announcing the rejection stated, in relevant part, the following:

> OKLAHOMA CITY, August 20, 2013 /CNW/—After careful consideration, the board of directors (the "Board") of Equal Energy Ltd. (the "Company" or "Equal") (NYSE:EQU) (TSX:EQU.TO) today unanimously rejected the non-binding expression of interest (the "New Proposal") received on August 14, 2013 from Montclair Energy, LLC ("Montclair").   As discussed in Equal's press release of August 15, 2013, the New Proposal revised Montclair's previous unsolicited and conditional expression of interest dated February 27, 2013.   In deciding to reject the New Proposal, the Board considered the recommendation of the Company's Special Committee and advice from its financial and legal advisors.
>
> Principal among the many factors considered by the Board in concluding that the New Proposal is not in the best interests of Equal and its stakeholders are that:
>
> • the price indicated in the New Proposal does not adequately value the unique strategic opportunity that Equal represents, particularly in light of the significant year-to-date drilling results, the 25% increase in reserves

disclosed in the Company's recent regulatory filings, the strong financial position of Equal and Conway propane prices moving above $1.00/gallon;

- the requirement for approval by the holders of two-thirds of the Company's convertible debentures of the offer to exchange the outstanding 6.75% publicly-listed convertible debentures for 7.75% non-convertible, seven year notes that will be subordinate to senior financing utilized to acquire the Company and introduces significant and unacceptable transaction risk;

- the New Proposal attempts to fetter the fiduciary duties of the Board by placing a limitation on what can constitute a "superior proposal";

- *the additional 60 day due diligence and exclusivity period following the negotiation of a letter of intent unduly impedes the resolution of the Company's strategic process*;

- *the lack of a reciprocal break-fee, if a transaction were not consummated as a result of Montclair being unable to move forward, to compensate the Company for its reasonable costs and potential lost opportunities while engaging exclusively with Montclair*; and

- the value of the New Proposal is lower than premiums typically paid in take-over offers and represents a premium of only 7% over the closing price on August 14, 2013, prior to the New Proposal being publicly announced and only 10% over the 20 day volume weighted average trading price ending on August 14, 2013.

"We are committed to creating shareholder value and will carefully consider any legitimate proposal that satisfies that objective" said Michael Doyle, Chairman of the Board.  Mr. Doyle added that "the Board is confident that Equal's assets, people and financial position will enable the Company to realize its true intrinsic value."

(Emphasis Added).

68.    Also on August 20, 2013, after purported unsuccessful attempts to come to an agreement with Company B, Equal delivered a letter to Company B indicating that it was terminating discussions and closing the data room to Company B.

69.    On August 21, 2013, after digesting the publicly disclosed information by Montclair and Equal, the financial advisor for Petroflow contacted GHS indicating that

Petroflow was now interested in negotiating a confidentiality agreement so it could gain access to the virtual data room.

70.     On August 28, 2013, Equal forwarded a letter to Montclair, Petroflow, and two other parties that still expressed some interest in a transaction with Equal outlining specific guidelines for companies in submitting an expression of interest. It appears Company A and Company B were not contacted during this process.

71.     On September 6, 2013, Equal received non-binding proposals from Montclair and Petroflow (*i.e.*, the parties with a prior relationship with the Company, see *supra* ¶ 33). Montclair offered $4.85 per share, but acknowledged that there was potential to increase the bid substantially based on the fact that Equal had recently public new information in regards to the valuation of its oil and gas reserves. Petroflow's offer was $5.25 per share.

72.     On September 10, 2013, the Special Committee instructed Equal management to negotiate further and execute (i) a confidentiality agreement with Petroflow and (ii) as per a request from Montclair, an amendment to the existing confidentiality agreement with Montclair.

73.     On September 24, 2013, Equal management and GHS gave a presentation to Petroflow management and its financial advisors.

74.     On September 27, 2013, Equal management had a conference call with Montclair's legal advisors to provide further diligence questions that Montclair had posed.

75.     On September 29, 2013, Equal received revised proposals from Montclair and Petroflow. Montclair increased its offer to $5.25 per share, while Petroflow reconfirmed its previous price of $5.25.

76.     On September 30, 2013, the Special Committee met with Equal's management to discuss the revised proposals. The Special Committee expressed a preference for the deal with

Petroflow because the its bid included a break fee of $2,000,000 and was "reciprocal." Montclair's bid included a $5,000,000 break fee and was non reciprocal.  The Special Committee also apparently took issue with the fact that Montclair's proposal was not subject to any break fee, ***even for failure to obtain the financing necessary to close the transaction***.

77.    On October 3, 2013, Equal received further revised bids from Montclair and Petroflow.  Montclair's offer was for $5.40 per share.  Petroflow's offer was for an aggregate consideration of $200 million for all of the issued and outstanding Equal shares, which equated to $5.43 per share.

78.    The whole Board, along with Equal management, met on the evening of October 3, 2013.  The Board determined that Petroflow's offer was better on price and ***stronger on the basis of the non-financial terms and execution risk***.  The Board then instructed GHS to inform Montclair that was not the successful bidder without asking Montclair to submit its best and final offer.  Also on October 6, 2013, the Board entered into a 60-day exclusivity period with Petroflow.

79.    On December 6, 2013, Montclair issued a press release stating its concerns about the strategic process.  Specifically, the press release state:

> Montclair Energy, LLC ("Montclair") today expressed its concerns about the ongoing strategic process being conducted by the Board of Directors of Equal Energy Ltd. (NYSE:EQU; TSX: EQU) ("Equal Energy" or the "Company").
>
> Montclair first expressed an interest in acquiring Equal Energy in February, 2013. Montclair's expression of interest followed the conclusion of the strategic review process carried out by the Equal Energy Board in 2012 that had failed to result in a sale transaction for the Company.  Collectively, the principals of Montclair are the Company's largest shareholder and most of the Company's assets in the Hunton formation of Oklahoma (which constitute the principal assets of the Company) were initially explored, owned and operated by Montclair's principals. Following the conclusion of the 2012 strategic review, Montclair recognized that existing management was not effectively operating the Company's assets and that

there was considerable room for the creation of value by taking the Company private.  These efforts to acquire the Company, were rejected by the Board.

On November 18, 2013, the Company announced that its Board continues to carry out a strategic review process that was initiated following Montclair's offer to acquire the Company and that it is in exclusive negotiations with a party that has made a proposal.  The Company has yet to provide any details about a proposed transaction.

Montclair is concerned that the Company's current strategic process is not being effectively conducted, and, like the strategic review conducted in 2012, could fail to maximize shareholder value or even fail to result in presentation of a transaction to shareholders for consideration.  Montclair notes that although the Company's share price has risen since Montclair initially expressed its interest, these gains have largely been fueled by shareholder anticipation of an acquisition transaction rather than renewed confidence in management.

As one of Equal Energy's largest shareholders, Montclair continues to consider all of its strategic options.  Should the Company's strategic review process fail to produce a value maximizing transaction for shareholders in the near term, Montclair will consider exercising its rights as a shareholder to propose a slate of independent directors for election to the Equal Energy Board of Directors.

**D.    The Proposed Buyout**

80.    On December 9, 2013, Equal issued a press release announcing the Proposed

Buyout, which stated, in relevant part, the following:

Equal Energy Ltd. ("Equal" or the "Company") (NYSE:EQU) (TSX:EQU) is pleased to announce that the Company has entered into a definitive agreement ("Arrangement Agreement") with Petroflow Energy Corporation and Petroflow Canada Acquisition Corp. (collectively defined as "Petroflow") for the cash purchase of all of the issued and outstanding common shares of Equal at a price of US$5.43 per share, on a fully-diluted basis.  The total transaction value, including net debt and transaction costs, is approximately US$230 million.  The transaction received unanimous approval by Equal's board of directors and will be completed by way of a plan of arrangement under the Business Corporations Act (Alberta) (the "Arrangement").

The US$5.43 per share offered represents a 56% premium to the US$3.49 closing price on March 22, 2013, the trading day prior to the Company's announcement that it was pursuing a strategic alternatives process.  The consideration is also a 23% premium to the US$4.43 closing price on November 18, 2013, the trading day prior to Equal's announcement that the strategic alternatives process successfully resulted in exclusive negotiations for a proposed transaction.

Equal's board of directors, with input from the Company's advisors and management team, unanimously determined that the Arrangement with Petroflow is in the best interest of the Company's shareholders.   In light of this determination, the Board has resolved to recommend that its shareholders vote their shares in favor of the Arrangement.   All members of management of the Company and its board of directors have indicated their intention to vote their shares in favor of the Arrangement.

The Arrangement must be approved by a vote of 66 2/3% of the votes cast by shareholders at a special meeting.

As per the Arrangement Agreement and subject to certain fiduciary exceptions, the Company has agreed that it will not solicit or initiate discussions with respect to any other business combination or sale of material assets.   In the Arrangement Agreement, Equal also made customary representations, warranties and covenants to Petroflow.

Pursuant to the Arrangement Agreement, a termination fee of US$2 million will be payable by the Company in certain circumstances.   These circumstances include if the Company terminates the Arrangement Agreement to enter into an agreement with a party other than Petroflow, in response to a superior proposal, or if the board of directors of the Company withdraws or modifies its recommendation in favor of the Arrangement with Petroflow.   Alternatively, a termination fee of US$2 million will be payable to the Company if Petroflow is unable to complete the Arrangement.

Following the effective date of the Arrangement, Petroflow will make an offer to purchase Equal's entire outstanding CAD $45 million of convertible debentures within 30 days.   In accordance with the terms of the indenture, cash consideration equal to 101% of the face value, plus accrued and unpaid interest, will be offered to holders of the convertible debentures.

Global Hunter Securities acted as the primary financial advisor to Equal in connection with the strategic alternatives process. Scotia Waterous also provided certain advisory services to Equal. Stikeman Elliott LLP and Dorsey & Whitney LLP acted as Canadian and US legal counsel, respectively, to the Company.

GMP Securities LLC and Kinetic Advisors LLC acted as financial advisors to Petroflow.   Kirkland & Ellis LLP and McMillan LLP acted as US and Canadian legal counsel, respectively, to Petroflow.

**E.      Shareholder Response to the Proposed Buyout**

81.      On December 10, 2013, Lawndale expressed concern over the Proposed Buyout.

Specifically, Lawndale issued a press release, which stated, in part, the following:

MILL VALLEY, Calif., Dec. 10, 2013 /PRNewswire/—Lawndale Capital Management, LLC and its affiliate funds ("Lawndale") own more than 1.7 million shares, or more than 4.8%, of the outstanding shares of Equal Energy, Ltd. (N-EQU) ("Equal" or the "Company,"), making Lawndale one of Equal's largest shareholders. Lawndale has reviewed the December 9, 2013 press release issued by Equal, announcing that the Company had entered into a definitive agreement to be acquired by Petroflow at a price of $5.43/share.

Lawndale feels a synergistic buyer should be able to easily grow Equal's cash flow. This higher cash flow should safely support modest increased borrowings that could fund a sizable stock buyback, a higher sustainable dividend on the lower share count and still be able to support substantial production and reserves growth. The resulting distribution combined with the remaining higher yielding Equal shares should combine in value to more than Petroflow's $5.43/share.

Lawndale's analysis notes that the proposed transaction is all-cash, squeezing out public shareholders from all benefits of Equal's future growth and value creation from its vast and valuable reserves and growing production streams. Lawndale also notes that Petroflow is a former operating partner of Equal's Oklahoma assets and the Company's current management. When such dangerous combinations occur Lawndale's policy is to request more thorough disclosure and apply greater scrutiny of the alternatives process for any value being transferred from Equal Energy shareholders to the buying group for which shareholders are not being compensated.

Equal's December 9 press release emphasizes the "fairness" of the transaction price and no longer discusses the company's bright economic prospects in light of substantial increases in industry propane prices and export capacity and Equal's own reserves and production outlook.

Andrew Shapiro, President of Lawndale, stated, "Proponents of transactions often try to argue the strength or 'fairness' of their bid by highlighting a purported 'premium' they are offering to pre-offer 'trading' prices. Price premium to historical trading is the weakest and most flawed measure of 'fairness.' Especially in small companies, pre-bid trading takes place in an inefficient vacuum, without any expectation of a definitive transaction or even a sleepy board and management being woken up. Thus, such 'trading' levels are very poor proxy to base an appropriate premium for transfer of a company's control."

Shapiro added, "We think better measures for fair takeover and change of control value are tested against net present value of discounted cash flows and/or valuation multiples to assets or prospective cash flows. Courts in appraisal actions take a similar view."

Lawndale's policy is to view any so-called "deal protections," which impede higher and better offers providing greater value to Equal shareholders, with great

suspicion.  This is especially so when there is legacy management continuation or sizable severance payouts.  "No-shop" clauses and "break-up" fees are examples of such deal protections that may not serve selling shareholders well and require great scrutiny.

Shapiro said, "Instead of focusing on price 'premiums,' we believe Equal's disclosure to shareholders, should have, and must, in the near future, detail the scope and extent of the bidding process along with Equal's reserves and production forecast provided to Petroflow.  Furthermore, Equal needs to provide to its shareholders, all the strategic alternatives considered and not considered, along with rationale for their rejection.  Finally, Equal should broadly disseminate how any interested alternative bidders may 'top' the agreed purchase price, rather than highlighting the impediments for such a superior bid that would provide greater value."

82.    On December 16, 2013, Montclair also expressed skepticism about the Proposed

Buyout by issuing a press release stating, in relevant part, the following:

Montclair Energy, LLC ("Montclair") today expressed its concerns about the terms of the December 6, 2013 Arrangement Agreement entered into by Equal Energy Ltd. (NYSE: EQU; TSX: EQU) ("Equal Energy" or the "Company") and PetroFlow Energy Corporation ("PetroFlow") providing for the acquisition of Equal Energy by a subsidiary of PetroFlow pursuant to a plan of arrangement at a price of US$5.43 per common share.  Collectively, the principals of Montclair hold approximately 5% of Equal Energy's common shares.

Montclair and its principals view the PetroFlow transaction as wholly inadequate on numerous grounds, including value, the uncertainty of financing ***and process***. Montclair agrees with the analysis of Lawndale Capital Management in its December 10, 2013 press release which noted, with improved operational efficiency, the Company could afford increased borrowings to fund a sizable stock buyback and generate a higher sustainable dividend, creating more value for shareholders than the $5.43 per share proposed in the PetroFlow transaction.

Chip Hazelrig, a principal of Montclair, stated, "As long suffering shareholders of Equal Energy, we have for some time recognized that the market has undervalued the Company.  However, we know that our fellow shareholders are patient investors who are willing to support changes that will restore the value of the Company's shares and give them the opportunity to realize the full potential value of their investment.  Shareholders should not have to sell out in a transaction that undervalues the Company.  Like Lawndale, we are prepared to reject the PetroFlow transaction in favor of restoring more astute managers who can maximize the value of the Company's Hunton properties and take the right steps with the Company's balance sheet."

Montclair expressed an interest in acquiring Equal Energy in February, 2013. Montclair's expression of interest followed the conclusion of the strategic review process carried out by the Equal Energy Board in 2012 that had failed to result in a sale transaction for the Company.  Most of the Company's assets in the Hunton formation of Oklahoma (which constitute the principal assets of the Company) were initially explored, owned and operated by Montclair's principals through their former company Altex Resources Inc.  Following the conclusion of the 2012 strategic review, Montclair recognized that existing management was not effectively operating the Company's assets and that there was considerable room for the creation of value by taking the Company private.  These efforts to acquire the Company, were rejected by the Board and in addition, some Equal Energy shareholders, including Lawndale, expressed their view that Montclair's proposed offer price undervalued the Company.

Montclair notes the following deficiencies in the PetroFlow transaction:

**Undervaluing the Company:** The price of US$5.43 would deprive shareholders of significant inherent value in their shares that could be realized through proper management.  Montclair believes that the better alternative for Equal Energy shareholders is to replace the current board of directors and management of the Company with directors and managers who have proven records of operating in the Hunton formation profitably and efficiently and giving such directors a mandate to take the steps necessary with respect to the Company's balance sheet to enhance shareholder value.  Such steps could include a substantial share buy-back that could be financed through modest increased borrowings and which would allow for a sustainable increase to the Company's dividend while still meeting the higher debt service payments.

**Cancellation of Dividends:** The Arrangement Agreement provides for the cancellation of all undeclared dividends prior to closing.  This means that shareholders will not receive the value of the dividends that they would otherwise receive in the first and potentially second quarter of 2014, in effect subsidizing the acquisition cost for PetroFlow.

**Highly Conditional on Financing:** The PetroFlow transaction is subject to a very high level of uncertainty with respect to the ability of PetroFlow to finance the transaction.  ***The Arrangement Agreement requires only that PetroFlow use "commercially reasonable efforts" to obtain financing for the transaction.  Should those efforts prove to be unsuccessful, PetroFlow has no obligation to close and would suffer no penalty (contrary to the Company's suggestion otherwise in its December 9, 2013 press release).***  Moreover, PetroFlow (a private company whose financial resources are unknown) has made no representation regarding its own financial resources or the amount of equity that it will commit to the acquisition.  In Montclair's experience,

this is a negligible commitment to the transaction. This is particularly disappointing in light of PetroFlow's history as a corporate entity that only emerged from bankruptcy proceedings in late 2011.

Given the difficulty that Equal Energy would have in proving that PetroFlow had not used commercially reasonable efforts to obtain financing, the Equal Energy Board has effectively granted PetroFlow a free six-month option to acquire the Company.  The highly conditional nature of the PetroFlow transaction is important information that was not disclosed in the Company's December 9th press release.

**Preclusive Exclusivity Provisions:** ***The Arrangement Agreement unduly restricts Equal Energy from seeking superior offers.  Such restrictions are inappropriate given the conditional nature of PetroFlow's obligations.  Moreover, although PetroFlow would be able to walk from the transaction without penalty if it is unable to obtain the necessary financing, Equal Energy is required to pay a US$2 million break-up fee to PetroFlow if the Company accepts a better offer***.

**Timing of Transaction:** After an extremely long strategic review process that followed a failure to sell the Company in 2012, the Company has given PetroFlow more than six months to complete the acquisition.  This length of time cannot be justified on the basis of regulatory approvals.  The length of time allowed for the completion of the transaction could result in further erosion to the consideration that shareholders will receive for their shares.

**Convertible Debentures:** The Company's convertible debentureholders should be particularly concerned about the ability of PetroFlow to finance the required follow-on offer for their debentures.  Such offer would only be made after the closing of the acquisition of the common shares by PetroFlow.  This leaves convertible debentureholders at the risk that PetroFlow will be unable to finance the follow-on offer.  Moreover, the obligation to make the follow-on offer will be an obligation of a subsidiary of PetroFlow and not PetroFlow itself.

**Insider Participation and Enrichment:** In light of the long standing relationships between PetroFlow, its former subsidiary North American Petroleum Corporation USA (NAPCUS) and the Company and its predecessor Enterra Energy Trust, Montclair believes that Equal Energy must provide greater transparency into the process that resulted in the PetroFlow transaction to assure shareholders that the transaction was negotiated on an arm's length basis.  The Company has not yet disclosed to shareholders to what extent existing management will have an ongoing role or receive collateral benefits in connection with PetroFlow's acquisition.  In addition, Montclair is concerned that the PetroFlow

transaction presents management with an opportunity to realize a quick profit from the acceleration of options and opportunistic share purchases and grants.  In particular, Montclair notes that following its February 27, 2013 offer to acquire the Company, but prior to any public disclosure of its offer which did not occur until March 25, 2013, the Company granted 153,090 restricted shares to Don Klapko, the Company's Chief Executive Officer, all of which will vest in connection with the closing of the PetroFlow transaction.   At the time of the grant the price of the Company's common shares traded at a significant discount to the price offered by Montclair and the proposed acquisition price in the PetroFlow transaction.

(Emphasis Added).

### F.      The Unfair Share Price

83.     In pursuing the unlawful plan to facilitate the acquisition of Equal by Petroflow for inadequate consideration as a result of a flawed sales process, each of the Defendants violated applicable law by directly breached and/or aiding the other Defendants' breaches of their fiduciary duties of loyalty, due care, good faith, and candor.

84.     For example, the Company's May 9, 2013 press release discussing the financial results for quarter ended March 31, 2013 ("1Q 2013") states that Equal's "new strategy . . . is paying off."  In discussing 1Q 2013 results, Klapko stated that "Equal expects to achieve [its] central Oklahoma growth target by drilling up to seven additional Hunton wells in the remaining nine months of 2013, building on its perfect success rate so far this year.  Commodity prices relative to last year appear to be moving in [the Company's] favor for the planned wells remaining in 2013."

85.     On August 8, 2013, the Company reported financial results for the second quarter of 2013 ("2Q 2013") ended June 30, 2013.  Klapko again boasted that he has "a strong level of confidence that [Equal] will hit [its] target production of 6,400 boe/d on average for the full year 2013" and that "[b]ased on the past 12 months of commodity pricing, [the Company's] drilling results run a dollar spent on drilling and completion into two dollars of PV[-]10 value for Equal."

86.     On November 7, 2013, the Company announced its financial and operation results for the third quarter of 2013 ("3Q 2013") ended September 30, 2013.  For 3Q 2013, Equal's revenues total $16.6 million, up a staggering 40% from $11.9 million for the same period in 2012.  In discussing 3Q 2013 results, Klapko stated that the Company's "drilling continues to deliver higher than budgeted reserves and production at an attractive cost" and "[h]aving averaged over 6,700 barrels for the third quarter, we are confident we will exceed our target production of 6,400 boe/d on average for the full year 2013."  Indeed, the 2013 drilling program continued during 3Q 2013 at a 100% success rate, with three new will drilled and two completed.

87.     Rather than permitting Equal's shares to trade freely and allow its public stockholders to reap the benefits of Equal's increasingly positive financial prospects, the Individual Defendants chose instead to sell Equal to Petroflow and cap the possible return for stockholders.

88.     The proposed acquisition price of $5.43 significantly undervalues the Company, as Equal's stock traded at $5.50 per share as recently as December 5, 2013 and $5.72 on December 6, 2013.  Indeed, on November 8, 2013, analyst Alistair Toward of PI Financial reiterated his buy recommendation and increased his Equal 12-month price target from $6.00 to $7.00.

89.     As a result, the Individual Defendants breached the fiduciary duties they owe to the Company's public stockholders because those stockholders will not receive adequate or fair value for their Company common stock in the Proposed Buyout.

## G.     The Windfall to the Individual Defendants

90.     Klapko and Equal's management stand to reap unique benefits for themselves at the expense of Equal stockholders.  Because the Proposed Buyout constitutes a "Change in

Control" event, the following chart reflects the lucrative payments Klapko and Equal

managements potentially stands to receive:

| Name[1] | Cash (USD$)[2] | Equity (USD$)[3] | Pension/ NQDC (USD$) | Perquisites/ Benefits (USD$)[4] | Tax Reimbursement (USD$) | Other (USD$)[5] | Total (USD$) |
|---|---|---|---|---|---|---|---|
| Don Klapko | 1,161,822[6] | 1,898,225[11] | N/A | 150,548 | N/A | 204,771 | 3,415,366 |
| John Chimahusky | 376,675[7] | 647,357[12] | N/A | 2,042 | N/A | N/A | 1,026,074 |
| Scott Smalling | 350,750[8] | 570,006[13] | N/A | 14,580 | N/A | N/A | 935,336 |
| Mark Rupert | 242,925[9] | 466,010[14] | N/A | 17,280 | N/A | N/A | 726,215 |
| Richard Dixon | 232,675[10] | 449,948[15] | N/A | 12,420 | N/A | N/A | 695,043 |
| Wendell Chapman | Nil | Nil | Nil | Nil | Nil | Nil | Nil |

**Note:**

[1] For the purposes of calculating amounts related to ownership of Options and Convertible Debentures in the table above, amounts in Canadian dollars were converted into U.S. dollars based on the Bank of Canada noon rate on December 24, 2013.

[2] Represents the estimated value of cash severance payments including any amounts in lieu of bonuses and cash amounts in lieu of Restricted Share grants, as applicable, upon termination of employment following completion of the Arrangement. The terms of these payments to our executive officers are summarized in the section of this circular entitled "*Interests of Our Directors and Officers in the Arrangement – Change in Control Agreements with Executive Officers*" beginning on page 80.

[3] Represents the total consideration to be received in connection with ownership of Restricted Shares and Options in connection with the Arrangement.

[4] Represents amounts to be received in lieu of benefits on termination following the Arrangement.

[5] Represents the total consideration to be received in connection with ownership of Convertible Debentures in connection with the Arrangement. Calculation of amounts to be received in connection with ownership of Convertible Debentures assumes that an offer to acquire such Convertible Debentures is made by Equal following the Arrangement in accordance with the terms of the Indenture in the amount of 101% of the principal of the Convertible Debentures plus accrued interest. Amounts of accrued interest were calculated as of December 24, 2013, for the purposes of this table only.

[6] Severance payments are based on a double trigger provision whereby the employee will receive severance if terminated by Equal following the Arrangement or if the employee terminates his employment within 60 days of the completion of the Arrangement. Includes a USD$494,393 cash amount in lieu of a grant of Restricted Shares, which Mr. Klapko is entitled to receive each year pursuant to his employment contract valued at 150% of Mr. Klapko's salary. As no additional Restricted Shares may be granted pursuant to the RSP Plan, allowance has been made for this amount to potentially be paid to Mr. Klapko by Equal in cash at completion of the Arrangement.

[7] Severance payments are based on a double trigger provision whereby the employee will receive severance if terminated by Equal following the Arrangement or if the employee terminates his employment within 6 months of the completion of the Arrangement by giving three months' notice.

[8] Severance payments are based on a double trigger provision whereby the employee will receive severance if terminated by Equal following the Arrangement or if the employee terminates his employment within 60 days of the completion of the Arrangement.

[9] Severance payments are based on a double trigger provision whereby the employee will receive severance if terminated by Equal following the Arrangement or if the employee terminates his employment within 6 months of the completion of the Arrangement by giving three months' notice.

[10] Severance payments are based on a double trigger provision whereby the employee will receive severance if terminated by Equal following the Arrangement or if the employee terminates his employment within 6 months of the completion of the Arrangement by giving three months' notice.

[11] Represents payments of nil on account of vested Options, payments of nil on account of unvested Options and payments of USD$1,898,225 on account of Restricted Shares.

[12] Represents payments of USD$9,408 on account of vested Options, payments of nil on account of unvested Options and payments of USD$637,949 on account of Restricted Shares.

[13] Represents payments of nil on account of vested Options, payments of USD$89,994 on account of unvested Options and payments of USD$480,012 on account of Restricted Shares.

[14] Represents payments of USD$5,226 on account of vested Options, payments of nil on account of unvested Options and payments of USD$460,784 on account of Restricted Shares.

[15] Represents payments of USD$5,226 on account of vested Options, payments of nil on account of unvested Options and payments of USD$444,722 on account of Restricted Shares.

**H.     The Board Impermissibly Locked-Up the Proposed Buyout**

91.    The Proposed Buyout is also unfair because, as part of the Arrangement Agreement, Defendants agreed to certain deal protection devices that operate conjunctively to ensure that no competing offers will emerge for the Company.

92.    First, the Board agreed to a provision in the Arrangement Agreement that prohibits Equal from releasing any interested suitor from a previously entered into confidentiality agreement and/or standstill provision.  Section 6.1(a)(v) states the following:

> [T]he Company shall not, directly or indirectly through any Representative of the Company, and shall cause each of its Subsidiaries not to, directly or indirectly through any Representative:
>
> . . . .
>
> (v) release any Person from, terminate, waive, amend or modify any provision of or otherwise forbear the enforcement of, any confidentiality or standstill agreement to which it or any of its Subsidiaries is a party, provided that, for avoidance of doubt, any release or deemed waiver from the standstill provisions of any such agreement in accordance with its terms without further agreement or action by the Company or any of its Subsidiaries shall not constitute a breach of this Section 6.1(a)(v).

93.    Then Section 6.1(c) of the Arrangement Agreement states:

> The Company shall enforce the provisions of any confidentiality and standstill agreement to which it or any of its Subsidiaries is a party, including by seeking injunctions to prevent any such breaches and to enforce specifically the terms and provisions thereof.

94.    Although Sections 6.3(a) and 6.3(b) of the Arrangement Agreement potentially provides a fiduciary out for Sections 6.1(a) if a *bona fide* acquisition proposal is offered to the Company that is greater than Petroflow's current offer, no such reprieve is provided for Section 6.1(c).  Thus, if a potentially interested third-party participated in the pre-signing sales process for Equal and executed a confidentiality agreement with a standstill, they are now precluded from submitting a superior proposal.

38

95.     This is where the Board's decision to embed an anti-waiver provision in the Merger Arrangement itself is especially troublesome.  When an interested bidder signs such a standstill, it might be deterred from approaching the target after a less than value-maximizing deal is announced for fear that a lawsuit from the bidder's board for breach of contract could lead to massive damages.  But that potential bidder would also know that the Board would be constrained by its fiduciary duty to obtain the best price reasonably available for its stockholders, and that the Board might well hesitate to enforce the standstill.  However, by embedding this provision in the Arrangement Agreement under Section 6.1(c) (without any reprieve), any aggrieved diligence party who would like to present a superior offer would not only be exposing themselves to breach of contract claims by the Board (in connection with the standstill itself), but would also expose themselves to tortious interference with contract claims from the acquiring party to the Arrangement Agreement (*i.e.*, Petroflow).  The Board and its advisors are thus forcing through their favorite deal.

96.     Second, under Section 6.1(a), the Arrangement Agreement contains a strict "no solicitation" provision prohibiting the members of the Board from taking any affirmative action to get a better price per share for the Company, including soliciting alternative acquisition proposals or business combinations.  Section 6.1(b) of the Arrangement Agreement also requires that the Company immediately cease and cause to be terminated any existing activities, discussions, or negotiations with any parties with respect to any alternative acquisition proposals.

97.     Third, the Arrangement Agreement also contains a "matching rights" provision, pursuant to which the Company must promptly notify Petroflow should it receive an unsolicited competing acquisition proposal.  Pursuant to Section 6.3(a) of the Arrangement Agreement, the Company must notify Petroflow of the bidder's identity and the terms of the

39

bidder's offer within twenty-four (24) hours.   Thereafter, if the Board determines that the competing acquisition proposal constitutes a "Superior Proposal," Section 6.6(b)–(c) requires the Board grant Petroflow five (5) business days to amend the terms of the Arrangement Agreement so that the alternative acquisition proposal would no longer constitute a "Superior Proposal."   The effect of these provisions is to prevent the Board from entering discussions or negotiations with other potential purchasers unless the Board can first determine that the competing acquisition proposal is, in fact, "superior," and even then, the Company must give Petroflow five (5) business days to match the competing acquisition proposal.   This severely limits the opportunity for a potential purchaser to emerge and severely limits the ability of the Board to properly exercise its fiduciary duties.

98.     Fourth, to further ensure the success of the Proposed Buyout, the Board locked up the deal by agreeing to pay a termination fee of $2,000,000 (Section 10.2 of the Arrangement Agreement).   The termination fee essentially requires the alternative bidder to pay a naked premium for the right to provide Equal stockholders with a superior offer.

99.     Ultimately, these deal protection devices restrain Equal's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.   The circumstances under which the Board may respond to an unsolicited alternative acquisition proposal that constitutes, or would reasonably be expected to constitute, a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.   Likewise, these provisions will foreclose the new bidder from providing the needed market check of Petroflow's inadequate offer.

### I.      The Materially Misleading Proxy

100.     On December 31, 2013, Equal filed the Proxy with the SEC.  The Proxy failed to provide the Company's stockholders with material information in contravention of the Board's duty of candor and in violation of Sections 14(a) and 20(a) of the Exchange Act.

101.     Without such information, Equal's stockholders will be unable to make a fully-informed decision as to whether to vote their shares for or against the Proposed Buyout.

### 1.      Materially Incomplete and Misleading Disclosures Concerning GHS's Financial Analysis

102.     The Proxy discloses certain information regarding GHS's financial analysis used to support its fairness opinion.   These disclosures concerning GHS's financial analysis are materially incomplete and misleading in several ways.

103.     First, the Proxy discloses, on page 48, discloses that GHS did not perform a discounted cash flow ("DCF") analysis in rendering the fairness opinion because it "would require additional, unavailable information."   Yet, as Lawndale noted in its December 10, 2013 press release discussed *supra*, the "better measures for fair takeover and change of control value are tested against net present value of discounted cash flows and/or valuation multiples to assets or prospective cash flows.  Courts in appraisal actions take a similar view."  Thus, the failure to conduct a DCF analysis renders GHS's fairness opinion highly suspect, and Equal's stockholders are unable to determine what weight, if any, to place to the fairness opinion in determining how to vote on whether to approve the Proposed Buyout.  Additionally, contrary to disclosure in the Proxy, projections exist through 2016 and the DCF can be done.

104.     Second, the Proxy, on page 45, touts the results of the *Premiums Paid Analysis* as "within the range of premiums paid in the selected merger and acquisitions transactions."  Again, as noted by Lawndale, "[p]roponents of transactions often try to argue the strength or 'fairness'

of their bid by highlighting a purported 'premium' they are offering to pre-offer 'trading' prices. Price premium to historical trading is the weakest and most flawed measure of 'fairness.' Especially in small companies, pre-bid trading takes place in an inefficient vacuum, without any expectation of a definitive transaction or even a sleepy board and management being woken up. Thus, such 'trading' levels are very poor proxy to base an appropriate premium for transfer of a company's control."  Thus, GHS's reliance on the premiums paid analysis is highly suspect, and Equal's stockholders are unable to determine what weight, if any, to place to the fairness opinion in determining how to vote on whether to approve the Proposed Buyout.

105.    Third, the Proxy, on page 45, in the *Premiums Paid Analysis* discloses that GHS considered 15 transactions in the analysis.   The Proxy however fails to disclose those transactions or the one day and one month premiums for each of those transactions.[2]  These omissions are material because without this information, Equal's stockholders are unable to fully understand GHS's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Buyout.

106.    Fourth, the Proxy, on pages 45 to 46, fails to disclose the metrics and multiples observed (*i.e.*, (i) Total Enterprise Value ("TEV"), (ii) TEV to Projected 2013 FY EBITDA, (iii) TEV to Projected 2014 FY EBITDA, and (iv) TEV to Most Recently Reported PV-10) by GHS for the list of comparable companies used to compare against Equal in the in the *Selected Public Companies Analysis*.  The Proxy also fails to disclose if other metrics and multiples were considered but excluded for the chosen comparable companies and whether other companies were considered but excluded from the analysis.  These omissions are material because without

---

[2]      This information is particularly material given the wide variance between low (0.3% for the one day premium and 5.8% for the thirty day premium) and the high (74.3% for the one day premium and 86% for the one month premium) ranges provided.

this information, Equal's stockholders are unable to fully understand GHS's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Buyout.

107.    Fifth, the Proxy, on pages 46 to 57, fails to disclose the implied per share dollar value range in the *Selected Public Companies Analysis*.  This omission is material because without this information, Equal's stockholders are unable to fully understand GHS's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Buyout.

108.    Finally, the Proxy, on page 47, fails to disclose the metrics and multiples observed (*i.e.*, (i) Target, (ii) Acquirer, (iii) Transaction Value, (iv) Proved Reserved (MMBOE), (v) USD\$/Proved BOE (Adv. Est.), (vi) Production (MBOE/d), (vii) USD\$/Daily Boe (Adv. Est.), and (viii) Proved Reserves (% Oil)) by GHS for the selected precedent transactions in the *Selected Asset Transaction Analysis*.[3]  The Proxy also fails to disclose if other metrics and multiples were considered but excluded for the chosen precedent transactions and/or whether other transactions were considered but excluded from the analysis.  These omissions are material because without this information, Equal's stockholders are unable to fully understand GHS's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Buyout.

## 2.    Materially Incomplete and Misleading Disclosures Regarding GHS's Compensation

109.    The Proxy (on page 50) discloses information about the compensation GHS received—and stands to receive—from the Proposed Buyout.  The Proxy however omits what

---

[3]    The multiples are particularly appropriate here given the wide variance between the low and high multiples ranges.

work, if any, GHS has done any work for either Equal or Petroflow, or any subsidiary or affiliate thereof, without the previous five (5) years. This information is material because it evinces if GHS had any conflict of interest when it issued the fairness opinion in support of the Proposed Buyout.

110. The Proxy (on page 50) also discloses that "[i]n the ordinary course of business, GHS and its affiliates may actively trade securities of Equal for their own accounts or the accounts of their customers. . . ." The Proxy however fails to quantify what, if any, positions GHS currently holds in either Equal or Petroflow. This information is material because it evinces if GHS had any conflict of interest when it issued the fairness opinion in support of the Proposed Buyout.

**3.     Materially Incomplete and Misleading Disclosures Concerning Regarding the Flawed Process**

111. The Proxy further omits important details regarding the process leading up to the signing of the Arrangement Agreement.

112. The Proxy discloses (on page 32) that during the 2012 strategic process, in the first round of bids, "Equal received 21 proposals, five of which were for all of Equal's assets and one additional bid on the Hunton assets only." The Proxy however fails to disclose the dollar value of the bids for the entire Company and whether Petroflow was the bidder interested in the Hunton assets. This information is material because it evinces the process the Board took to maximize shareholder value, including the value placed by potential suitors on the Company and its assets in 2012.

113. The Proxy discloses (also on page 32) that "[o]n August 22, 2012, Equal received nine proposals with one being for the Hunton assets only. . . ." The Proxy fails to disclose the dollar value of the offers and whether Petroflow was the bidder interested in the Hunton assets.

44

This information is material because it evinces the process the Board took to maximize shareholder value, including the value placed by potential suitors on the Company and its assets in 2012.

114.    The Proxy discloses (on page 33) that during the 2012 strategic process, "[o]ne party had a superior offer and entered into negotiations with Equal regarding the potential sale of [Central Oklahoma Hunton] assets, but the Board ultimately made the decisions to retain the assets and build Equal around those assets on a go-forward basis."  The Proxy fails to disclose the rationale for building around the Hunton assets or whether Petroflow was the party with a superior offer.  This information is material because it evinces the process the Board took to maximize shareholder value, including the value placed by potential suitors on the Company and its assets in 2012.

115.    The Proxy discloses (also on page 33) that "[o]n January 31, 2013, Equal received a proposal from an interested party ("Company A") relating to a potential business combination. The Board and management of Equal reviewed the proposal and decided that it was inadequate and, as such, on February 11, 2013, Equal indicated to Company A that it was not interested in pursuing further negotiations."  The Proxy fails to disclose that dollar value of Company A's offer and does not explain why a special committee was not formed to consider the proposal. This information is material because it evinces the process the Board took to maximize shareholder value, including the value placed by potential suitors on the Company.

116.    The Proxy discloses (on page 34) that "on March 25, 2013, Equal advised that it had previously formed the Special Committee in early March 2013 to investigate and evaluate all proposals presented to Equal, including the Montclair proposal for USD$4.00 per Equal Share. The Special Committee further advised that it had retained GHS and Scotiabank to assist in

considering such expressions of interest in a deliberate and thoughtful manner. . . ."  The Proxy fails to disclose the identity of the members of the Special Committee or the process the Special Committee took to select GHS as its financial advisor.  This information is material because it evinces (i) the process the Board took to maximize shareholder value and (ii) the conflicts of interests, if any, the members of the Special Committee have in regards to the Proposed Buyout.

117.    The Proxy discloses (also on page 34) that "Company A presented Equal with another business combination proposal which was below the previous $4.00 offer price that Montclair had presented."  The Proxy fails to disclose the dollar value of Company A's revised offer.  This information is material because it evinces the process the Board took to maximize shareholder value, including the value placed by potential suitors on the Company.

118.    The Proxy discloses (also on page 34) that "[o]n April 16, 2013, Petroflow indicated that it was not going to participate in the process and did not execute the confidentiality agreement that was previously sent over by Equal."  The Proxy fails to disclose whether Petroflow provided any rational for its refusal to participate in the process.  This information is material because it evinces the process the Board took to maximize shareholder value, including the value placed by potential suitors on the Company.

119.    The Proxy discloses (also on page 34) that "[o]n April 23, 2013, Equal received a revised non-binding proposal from Company A."  The Proxy however fails to disclose the dollar amount of Company A's revised proposal.  This information is particularly material because Company A sought to make a presentation to the Board, but the Board outright refused, thereby removing Company A from the strategic process.  This information is material because it evinces the process the Board took to maximize shareholder value, including the value placed by potential suitors on the Company.

120.    The Proxy discloses (also on page 34) that on May 1, 2013 "Equal received an indication of interest from one of the parties involved in the process ("Company B")."  The Proxy however fails to disclose the dollar amount of Company B's indication of interest.  This information is material because it evinces the process the Board took to maximize shareholder value, including the value placed by potential suitors on the Company.

121.    The Proxy (also on page 34) then discloses that "[t]he Special Committee, after discussing the matter with Equal management and GHS decided that while the proposal from Company B had certain aspects that were not acceptable to Equal[,] there were certain aspects that were compelling."  The Proxy fails to provide the "not acceptable" and "compelling" aspects of Company B's proposal.  This information is material because it evinces the process the Board took to maximize shareholder value, including the value placed by potential suitors on the Company.

122.    The Proxy (on pages 34 to 35) discloses "Equal forwarded a counter-proposal to representatives from Company B later on May 27, 2013.  Representatives from Company B responded on May 28, 2013 and noted that a number of changes proposed in the counter-proposal from Equal were acceptable, but there were some aspects of the counter-proposal that needed to be revised to be acceptable to Company B."  The Proxy fails to provide (i) the dollar amount of Equal's counter-proposal and (ii) what aspects of the counter-proposal needed to be revised to be acceptable to Company B.  This information is material because it evinces the process the Board took to maximize shareholder value, including the value placed by potential suitors on the Company.

123.    The Proxy (on page 35) then discloses that "[o]n May 28, 2013, Company B provided two further alternatives to the counter-proposal."  The Proxy fails to provide a

summary of Company B's two alternatives.  This information is material because it evinces the process the Board took to maximize shareholder value, including the value placed by potential suitors on the Company.

124.    The Proxy (also on page 35) discloses that "[a]fter extensive discussions the Board resolved that [Company B's] proposal required further study and directed Equal management and advisors to continue with diligence, but not proceed with further negotiations of a definitive agreement at that time."  The Proxy fails to explain why the Board did not want to proceed with a definitive agreement with Company B at that time.  This information is material because it evinces the process the Board took to maximize shareholder value, including the value placed by potential suitors on the Company.

125.    The Proxy (also on page 35) discloses "[o]n June 14, 2013, Equal executed the indication of interest and entered into an exclusive negotiation with Company B.  Following the execution of the indication of interest Equal engaged in no further contact with any other parties and on June 26, 2013, Equal sent correspondence to the five other parties that had executed confidentiality agreements informing them that access to the virtual data room was being revoked immediately."  The Proxy fails to explain whether any of these five parties were contacted after the exclusivity period with Company B expired.  This information is material because it evinces the process the Board took to maximize shareholder value, including the value placed by potential suitors on the Company.

126.    The Proxy (on page 36) discloses that the "Special Committee instructed Equal management to negotiate and execute a confidentiality agreement with Petroflow and as per a request from Montclair, an amended to the existing confidentiality agreement."  The Proxy fails to explain the substance of the amendment sought by Montclair.  This information is material

because it evinces the process the Board took to maximize shareholder value, including the value placed by potential suitors on the Company.  Amendments to the confidentiality agreement are particularly material given the anti-waiver provision in the Arrangement Agreement.

127.    The Proxy (on Page 39) discloses that "[o]n November 21, 2013, Petroflow's counsel provided an initial draft of the form of Option Cancellation Agreement to Equal's legal advisors."  The Proxy however fails to disclose when the Option Cancellation Agreement was negotiated or even discussed.  This information is material because it evinces the process the Board took to sign the Arrangement Agreement.

128.    The Proxy (on Page 39) discloses that "[o]n November 30, 2013, Petroflow's counsel provided an initial draft of the form of Lock-Up Agreement to Equal's legal advisors." The Proxy however fails to disclose when the Lock-Up Agreement was negotiated or even discussed.  This information is material because it evinces the process the Board took to sign the Arrangement Agreement.

129.    Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Equal stockholders will continue to suffer absent judicial intervention.  At a minimum, Plaintiff seeks to enjoin the deal protections and keep the Proposed Buyout open for a reasonable time to allow competing suitors to put in a topping bid, and, in the event the Proposed Buyout is consummated at less than the highest price reasonable available for Equal, to recover damages as a result of the violations of law alleged herein.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class for Breach of Fiduciary Duties
Against the Individual Defendants**

130.    Plaintiff repeats and realleges each and every allegation set forth herein.

131.    The Individual Defendants have violated fiduciary duties of loyalty, due care, good faith, and candor owed to public stockholders of Equal and have acted to put their personal interests ahead of the interests of Equal stockholders.

132.    By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Equal.

133.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, due care, good faith, and candor owed to Equal stockholders because, among other reasons, they failed to take steps to maximize shareholder value, by, among other things, failing to adequately consider potential acquirers, instead favoring their own, or their fellow directors' or executive officers' interests to secure all possible benefits with a friendly suitor, rather than protect the best interests of Equal stockholders.  Moreover, the Individual Defendants have failed to fully disclose to Plaintiff and the Class all material information necessary to make an informed decision regarding whether to vote in favor of the Proposed Buyout.

134.    By reason of the foregoing acts, practices, and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

135.    As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Equal's assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

136.    Unless Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

137.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendant's actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class Against Equal, Petroflow, and Merger Sub for Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duties**

138.    Plaintiff repeats and realleges each allegation set forth herein.

139.    Equal, Petroflow, and Merger Sub (the "Entities") have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Equal's public stockholders, and have participated in such breaches of fiduciary duties.

140.    The Entities knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, the Entities rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Buyout in breach of their fiduciary duties.

141.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendant's actions threaten to inflict.

## COUNT III

### On Behalf of Plaintiff Against Equal, Petroflow, Merger Sub, and the Individual Defendants for Violations of Section 14(a) of the Exchange Act

142.    Plaintiff repeats and realleges each allegation set forth herein.

143.    Plaintiff brings this Exchange Act claim on behalf of himself as an individual only.

144.    Equal, Petroflow, Merger Sub, and the Individual Defendants have caused the Proxy to be issued with the intention of soliciting stockholder support of the Proposed Buyout.

145.    Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Buyout.  Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

146.    As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

147.    By virtue of the foregoing, Equal, Petroflow, Merger Sub, and the Individual Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9.  The Proxy violates Section 14(a) and SEC Rule 14a-9 because it omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Equal, Petroflow, Merger Sub, and

the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material facts that are necessary to render then non-misleading.

148.    The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully-informed decision if such misrepresentations and omissions are not corrected prior to the stockholder vote on the Proposed Buyout.

## COUNT IV

### On Behalf of Plaintiff Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

149.    Plaintiff repeats and realleges each allegation set forth herein.

150.    Plaintiff brings this Exchange Act claim on behalf of himself as an individual only.

151.    The Individual Defendants acted as controlling persons of Equal within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Equal, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

152.    Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

153.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Buyout.  They were, thus, directly involved in the making of this document.

154.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Buyout.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

155.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

156.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

157.    As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representative;

B.    Appointing Plaintiff's counsel as Class Counsel;

C.      Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Buyout, unless and until the Company adopts and implements a procedure or process to obtain an arrangement agreement providing fair terms to stockholders and requiring Defendants to fully disclose to Plaintiff and the Class all material information necessary to make an informed decision regarding whether to vote in favor of the Proposed Buyout;

D.      Rescinding, to the extent already implemented, the merger or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

E.      Directing the Individual Defendants to account to Plaintiff  and the Class for all damages suffered as a result of the Individual Defendants wrongdoing;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

G.      Granting such other and further equitable relief as this Court may deem just and proper.

### JURY TRIAL DEMAND

Plaintiff demands a trial by jury for all claims so triable.

DATED: January 13, 2014                      Respectfully submitted,

                                             s/ Jack C. Moore
                                             **HARTMAN, BLACKSTOCK & MOORE**
                                             Andrew S. Hartman, OBA #3948
                                             Jack C. Moore, OBA #14283
                                             6520 S. Lewis Avenue, Suite 15
                                             Tulsa, Oklahoma 74136
                                             Tel: (918) 712-3246
                                             Fax: (918) 712-5042
                                             E-mail: jack.moore@andrewshartman.com

**FARUQI & FARUQI, LLP**
Juan E. Monteverde
369 Lexington Ave., Tenth Floor
New York, NY 10017
Tel: 212-983-9330
Fax: 212-983-9331
E-mail: jmonteverde@faruqilaw.com

*Attorneys for Plaintiff*